GILMAN, J., delivered the opinion of the court, in which GRIFFIN, J., joined and STRANCH, J., joined in part. STRANCH, J. (pp. 407-15), delivered a separate opinion concurring in part and dissenting in part.
OPINION
RONALD LEE GILMAN, Circuit Judge.
These seven consolidated cases are among the many that have been filed nationwide against the manufacturers of both the prescription drug Reglan and its generic equivalent, metoclopramide. The plaintiffs allege that they ingested generic metoclopramide and, as a result, developed a serious neurological disorder known as tardive dyskinesia. They filed suit against both the generic and brand-name manufacturers, alleging a wide variety of product-liability claims.
The makers of the generic metoclopram-ide moved to dismiss the claims against them, arguing that all of the plaintiffs’ claims are preempted by the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301-399f, under the Supreme Court decision in PLIVA, Inc. v. Mensing, — U.S.-, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). And the brand-name manufacturers moved for summary judgment, contending that they are not. liable to the plaintiffs because none of the plaintiffs ingested Reglan.
' The district court granted both motions. For the reasons set forth below, we AFFIRM the judgment of the district court and DENY the plaintiffs’ pending motion to certify a proposed question to the Tennessee Supreme Court.
I. BACKGROUND
A. Factual background
The basic facts are undisputed, and the lawsuits filed in the district court for each of the consolidated cases are identical to one another. We will therefore refer to the seven consolidated cases as “the present case.”
The manufacturers of Reglan are Alaven Pharmaceuticals LLC; Pfizer, Inc.; Schwarz Pharma, Inc.; Wyeth Pharmaceuticals, Inc.; Wyeth LLC; and Wyeth, Inc. We will refer to these defendants collectively as the Brand-Name Manufacturers. The makers of generic metoclopramide are *384 Actavis Elizabeth LLC; Barr[1] Pharmaceuticals, Inc.; Duramed Pharmaceuticals, Inc.; Generics Bidco I LLC; McKesson Corporation; Mutual Pharmaceutical Co.; Northstar RX, LLC; PLIVA, Inc.; Ran-baxy Pharmaceuticals, Inc.; TEVA Pharmaceuticals USA, Inc.; The Harvard Drug Group; United Research Laboratories, Inc.; and Watson Laboratories, Inc. We will refer to these defendants collectively as the Generic Manufacturers.
The district court took the following facts from the plaintiffs’ amended complaint as true for the purpose of ruling on the Generic Manufacturers’ Motion to Dismiss:
Reglan is a prescription drug, and meto-clopramide is its generic bioequivalent. (Am.ComplJ 6.) Reglan and metoclo-pramide’s product labeling recommends them for use as short-term therapies for symptomatic gastroesophageal reflux— heartburn — and acute and recurrent diabetic gastric stasis — bloating. (Id. ¶ 13.) The labels recommend therapy for up to twelve weeks in adults for heartburn, but they did not contain a durational limit for bloating. (Id. ¶ 14.) At no time have Reglan or metoclopramide been shown to be either efficacious or safe when used for long-term treatment. (Id. ¶ 15.)
Reglan and metoclopramide affect the brain’s movement center, typically causing involuntary, repetitive movements. (Id. ¶ 7.) Overuse of Reglan and meto-clopramide can result in extra-pyramidal symptoms including, but not limited to, tardive dyskinesia, dystonia, and akathi-sia, Parkinsonism, and Reglan-induced tremors. (Id. ¶ 8.) Reglan and metoclo-pramide have also been associated with central nervous system disorders, depression with suicidal ideation, visual disturbances, and memory loss. (Id.) Tardive dyskinesia, dystonia, and akathi-sia are- serious neurological movement disorders resulting in involuntary and uncontrollable movements of the head, neck, face, arms, or truck [sic], as well as involuntary facial grimacing and tongue movements, including tongue ■ thrusting, tongue chewing, extreme anxiety, and restlessness or other involuntary movements. (Id. ¶ 9.) These disorders have no known cure. (Id. ¶ 10.) Patients using Reglan or metoclopram-ide for longer periods, of time are at an “unreasonably dangerous increased risk of developing one or more severe and permanent neurological movement disorders, significantly., and substantially greater than disclosed or suggested in the product labeling for the drug or in any other materials disseminated by the defendants to either the medical community or the public.” (Id. ¶ 16.) Ordinary consumers would not appreciate the risk of developing one or more incurable severe neurological movement disorders when taking Reglan or metoclo-pramide as discussed above. (Id. ¶ 17.) Similarly, a prudent manufacturer would not market Reglan or metoclopramide due to the risk of severe and permanent neurological movement disorders and the availability of less dangerous alternative treatments. (Id. ¶ 18.)
Reglan is the reference listed drug (“RLD”) in abbreviated new drug applications (“ANDAs”) for generic versions of metoclopramide. (Id. ¶25.) ANDAs for new drugs must disclose to the Food and Drug Administration (“FDA”) the drug’s chemistry, pharmacology, and other matters, including its proposed labeling. (Id. ¶26.) For the FDA to approve a drug’s ANDA, its ANDA must include proposed labeling which discusses data and information about the risks and side effects of the drug, the drug’s test results, results of animal studies, results of clinical studies, and *385 the drug’s bioavailability, all of which enable physicians or other foreseeable prescribers to use the drug safely. (Id.) Federal law requires the owner of an FDA-approved ANDA to ensure that the drug’s labeling remains accurate and adequate, to conduct safety surveillance . for adverse drug effects, and to periodically report to the FDA data related to the safety of the drug or the accuracy of its label. (Id. ¶ 27.) The FDA has not approved Reglan and metoclopramide for long-term or pediatric use. (Id. ¶ 28.)
The Amended Complaint contains three categories of claims: those against the Brand Name Defendants, the Generic Defendants, and all Defendants.... Plaintiffs allege that all Defendants knew or should have known that most physicians did not know or fully appreciate the seriousness of the risks associated with Reglan or metoclopramide. (Id. ¶ 31.) Moreover, all Defendants knew that physicians commonly prescribed the drug for inappropriate long term and pediatric use, as well as short term use for certain adults. (Id.) Thus, all Defendants “should have known that the Physician’s Desk reference monograph for Reglan and the package inserts for Re-glan and metoclopramide were deficient, inaccurate, [or] false and misleading in communicating [information] to the medical community in general, to physicians, or to the public.” (Id.) Plaintiffs allege that all Defendants “failed to adequately inform physicians and misled [them] about the risks associated with their me-toclopramide drug products.” (Id. ¶ 33.) Plaintiffs aver that all Defendants “knew or ... should have known that the labeling for Reglan and generic metoclo-pramide substantially understated the frequency of acute and long term side effects of the drug.” (Id. ¶ 35.) Thus, all Defendants “failed to use reasonable care to ascertain or communicate to physicians or to the public information that would constitute adequate and effective warnings.” (Id.) Additionally, all Defendants knew through their own studies or “publicly available published literature” that doctors commonly prescribed meto-clopramide for longer than twelve weeks, for pediatric use, or in other unsafe situations. (Id. ¶ 37.) All Defendants also knew that their “individual and collective failure to communicate [information] to the medical community ... about the risks of long term and other metoclopramide therapy would ... likely' ... result in serious injury.” (Id. ¶ 38.) Defendants failed to adequately communicate this information and failed to exercise due care to ensure that their warnings were effectively communicated; Defendants also had a duty to adequately communicate these warnings. (Id. ¶ 38-39.) All Defendants breached this duty in a number of ways. (Id. ¶4(^-4(^.) Moreover, all Defendants “failed to make reasonable efforts to ensure that accurate and adequate information regarding metoclo-pramide was provided to the medical community” and consumers or “to inform the FDA of the need for changes to its label.” (Id. 148.)
The Amended Complaint also contains facts related directly to the Generic Defendants’ “failure to communicate adequate warnings.” (Id. at 22.) The Food, Drug, and Cosmetic Act (“FDCA”) requires a generic drug’s ANDA to include proposed labeling identical to the brand-name RLD in all material .respects. (Id. ¶ 43.) Accordingly, the Generic Defendants submitted ANDAs for metoclopramide containing labels identical to the FDA-approved label for Reglan. (Id. ¶ 44.) The Generic Defendants had several duties, including *386 the duty to ensure that their metoclo-pramide labels contained accurate information regarding the drug’s intended uses and other common uses, to conduct post-market safety surveillance, to review adverse drug event information, to make timely revisions to the labels after revisions were made to the RLD label, and to ensure that information regarding the drug’s safety was communicated to the medical community and consumers. (Id. ¶ 46.) The Generic Defendants were also required to effectively communicate the labels and their warnings to physicians and patients. (Id.) Plaintiffs allege that the Generic Defendants violated these duties in a number of ways, including by failing to “actually and effectively communicate” the labels and their warnings, to properly evaluate and understand how physicians and patients were using metoclopramide, to properly research, test, and market me-toclopramide, to periodically review all medical literature, to independently monitor metoclopramide sales to alert them that it was widely overprescribed due to inadequate warnings, and to engage in marketing practices designed to minimize the risks associated with meto-clopramide. (Id. ¶ 47a-47f.)
On February 26, 2009, the FDA exercised its new agency powers and ordered all Defendants to add a black box warning to Reglan’s label. (Id. ¶49.) This new warning — the strongest available under FDA regulations — highlighted the “high risk of tardive dyskinesia with long term, high dose, or pediatric use of metoclopramide, even after the drugs are no longer taken.” (Id.) The FDA also required all Defendants to create a Risk Evaluation and Mitigation Strategy to ensure that they communicated information regarding the risks associated with metoclopramide directly to the consumers of the drug. (Id. ¶ 50.) Plaintiffs allege that prior to 2007, when the FDA did not have the authority to demand such action from drug companies, all Defendants knew that the meto-clopramide and Reglan warnings were insufficient, but they “did nothing to communicate accurate information to individuals prescribing and consuming me-toclopramide.” (Id. ¶ 51.) Plaintiffs aver that they were injured due to overexposure to Reglan or metoclopramide caused by all Defendants’ failure “to monitor the safety of their drug products, to provide accurate and complete information to the FDA, to use reasonable means to correct inaccuracies appearing in their labels, to communicate to the medical community, physicians, Plaintiffs’ physicians, Plaintiffs[,] and other foreseeable users of the drug adequate warnings about risks associated with common and foreseeable uses of their metoclopramide products.” (Id. ¶ 54.) “Concurrently, Plaintiffs’ injuries came about as a foreseeable and proximate result of [all Defendants’ inaccurate, misleading, materially incomplete, and otherwise false information concerning the potential effects of exposure to the drug substance metoclopramide and the ingestion of metoclopramide products manufactured and sold by [all] Defendants.” (Id.)
Stryhorn v. Wyeth Pharm., Inc., 887 F.Supp.2d 799, 804-806 (W-D.Tenn.2012) (alterations other than [sic] in original).
In á separate order granting summary judgment to the Brand-Name Manufacturers, the district court noted an additional material fact not in dispute by the parties: “Plaintiffs in this case never took Reglan; rather, they ingested only generic metoclo-pramide manufactured by companies other than [the] Brand Name Defendants.” Stryhorn v. Wyeth Pharm., Inc., 882 F.Supp.2d 1020, 1025 (W.D.Tenn.2012).
*387 B. Procedural background
In November 2011, after the Supreme Court’s decision in PLIVA, Inc. v. Mensing, — U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), the plaintiffs filed amended complaints, all of which are identical. The Generic Manufacturers moved to dismiss the amended complaints, arguing that the plaintiffs’ various claims boiled down to the single claim that the Generic Manufacturers had failed to provide adequate warnings to medical professionals about the dangers of long-term use of me-toclopramide. These defendants argued that, under Mensing, state-law failure-to-warn claims against generic drug manufacturers are preempted because federal law prohibits generic manufacturers from unilaterally altering their warning labels; therefore, generic manufacturers cannot simultaneously comply with both federal and state law.
The district court agreed that Mensing controlled. It concluded that the plaintiffs had abandoned their claims for unfair and deceptive trade practices/conspiracy ■ and for unjust enrichment, and further determined that all of the plaintiffs’ other claims against the Generic Manufacturers were essentially failure-to-warn claims preempted under Mensing. The plaintiffs do not challenge the court’s determination regarding those claims deemed abandoned, but they do challenge the dismissal of all of their other claims. .
The Brand-Name Manufacturers separately moved for summary judgment on the ground that the Tennessee Products Liability Act, Tenn.Code Ann.. §§ 29-28-101 et seq. (TPLA), allows for recovery solely against the manufacturer or the seller of the product actually causing the harm. Because the plaintiffs did not ingest Reglan, but only generic- metoclo-pramide, the Brand-Name Manufacturers argued that they could not be held liable. Agreeing with the Brand-Name Manufacturers, the district court granted summary judgment in their favor.
II. ANALYSIS
A. Standard of review

1. Motion to dismiss

To survive a motion to dismiss for failure to state a claim, a complaint must allege sufficient facts that, accepted as true, “state a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 8, 68 (2009). When determining facial plausibility, the court must construe the complaint in the light most favorable to the plaintiff. Lambert v. Hartman, 517 F.3d 433, 439 (6th Cir.2008). The district court’s grant of a motion to dismiss is reviewed de novo. Paige v. Coyner, 614 F.3d 273, 277 (6th Cir.2010).

2. Motion for summary judgment

Summary judgment is proper when “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.” Anderson v. Liberty *388 Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review de novo a district court’s grant of summary judgment. Huckaby v. Priest, 636 F.3d 211, 216 (6th Cir.2011).
B. Claims against the Generic Manufacturers
Our analysis of the claims against the Generic Manufacturers is guided by two recent decisions of the United States Supreme Court: PLIVA, Inc. v. Mensing, — U.S.-, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), and Mutual Pharmaceutical Co. v. Bartlett, — U.S. -, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). We will therefore begin with a detailed discussion of these two decisions.
1. PLIVA, Inc. v. Mensing
In Mensing, which involved consolidated appeals from decisions by the Fifth and Eighth Circuits, the Supreme Court held that state-law failure-to-warn claims against generic manufacturers of metoclo-pramide are preempted by federal law. The Court first noted that the Louisiana and Minnesota tort laws at issue “require a drug manufacturer that is or should be aware of its product’s danger to label that product in a way that renders it reasonably safe.” Mensing, 131 S.Ct. at 2573. Federal law, on the other hand, imposes different requirements. A brand-name manufacturer must prove that its proposed drug is “safe and effective and that the proposed label is accurate and adequate,” which occurs by way of clinical testing. Id. at 2574. But under the 1984 Drug Price Competition and Patent Term Restoration Act, 98 Stat. 1585 (popularly known as thdHateh-Waxman Amendments to the FDCA), generic drugs may be approved if their active ingredients are equivalent to a reference listed drug (RLD) — generally a brand-name drug — that has already been approved by the FDA. Generic drugs’ proposed labels must be “the same as the labeling approved for the brand-name drug” in order to gain approval by the FDA. Id. (brackets and internal quotation marks omitted). The issue was therefore whether “it was impossible” for generic drug manufacturers to simultaneously comply with both state and federal labeling laws. Id. at 2578.
Although the plaintiffs in Mensing argued that generic manufacturers could unilaterally change their labels under the FDA’s “changes-being-effeeted” (CBE) process, which permits certain preapproval labeling changes that add or strengthen a warning to improve drug safety, the FDA contended that the CBE process could not be used by generic manufacturers in this manner. This is because the FDA “interprets the CBE regulation to allow changes to generic drug labels only when a generic drug manufacturer changes its label to match an updated brand-name label or to follow the FDA’s instructions.” Id. at 2575. Nor could the generic manufacturers have used “Dear Doctor” letters to send warnings to healthcare professionals because, according to the FDA, such letters are considered “labeling” and must match the prescription drug’s approved labeling; Id. at 2576.
The Supreme Court acknowledged that “[h]ad Mensing and Demahy taken Reglan, ... Wyeth [v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009),] would control and their lawsuits would not be pre-empted.” Id. at 2581. In Levine, the Supreme Court held that state-law failure-to-warn claims against a brand-name manufacturer are not preempted by federal law because such manufacturers have the capability of complying with both state and federal law. 555 U.S. at 571, 129 S.Ct. 1187. The Mensing Court noted that, from the plaintiffs’ perspective, “finding *389 pre-emption [in Mensing ] but not in Wyeth makes little sense.” Mensing, 131 S.Ct. at 2581. Despite the apparent unfairness of the result, the Court rested its decision on the fact that “the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.” Id. at 2582. It further commented that the unique regulation of generic drugs has allowed the generic-drug industry to flourish and has brought cheaper drugs to the market. Id. The Court declined to “decide whether the statutory scheme established by Congress is unusual or even bizarre,” noting that “Congress and the FDA retain the authority to change the law and regulations if they so desire.” Id. (internal quotation marks omitted).
2. Mutual Pharmaceutical Co. v. Bartlett
The Supreme Court recently reaffirmed Mensing in Mutual Pharmaceutical Co. v. Bartlett, — U.S.-, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). Bartlett took sulin-dac, a generic nonsteroidal anti-inflammatory drug. She developed toxic epidermal necrolysis, a condition in which the skin deteriorates or turns into an open wound. Bartlett sued the manufacturer of generic sulindac in New Hampshire, asserting failure-to-warn and design-defect ' claims. New Hampshire’s strict-liability regime imposes a duty on manufacturers “to ensure that the drugs they market are not unreasonably unsafe.” Bartlett, 133 S.Ct. at 2470. On appeal,- the First Circuit affirmed the jury’s finding of liability and its award of $21 million in damages to Bartlett. In concluding that Bartlett’s design-defect claim -was not preempted under Mensing, the First Circuit reasoned that the generic manufacturer “could simply choose not to make the drug at all and thus comply with both federal and state law.” - Id. at 2472 (internal quotation marks omitted).
The Supreme Court reversed. It first noted that “New Hampshire’s design-defect cause of action imposes affirmative duties on manufacturers,” including the “duty to design [a] product reasonably safely for the uses which [the manufacturer] can foresee.” Id. at 2473 (internal quotation marks omitted). Specifically, design-defect liability is imposed in New Hampshire when “the design of the product create[s] a defective condition unreasonably dangerous to the user.” Id. at 2474 (internal quotation marks omitted). A product is unreasonably dangerous under the New Hampshire Süpreme Court’s “risk-utility approach” “if the magnitude of the danger outweighs the utility of the product.” Id. This inquiry balances
the usefulness and desirability of the product to the public as a whole, whether the risk of danger could have been reduced without significantly affecting either the product’s effectiveness or manufacturing cost, and the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses.
Id. at 2475 (internal quotation marks omitted).
The Supreme Court reasoned that the first two factors (increasing the usefulness and desirability of the product and reducing the risk of harm) would require redesign of the product, which is not possible under FDA regulations that require generic drugs to have the same active ingredients as brand-name drugs. Redesign of the product was also not possible because sulindac is a one-molecule drug. Therefore, “the only way for [the generic manufacturer] to ameliorate the drug’s ‘risk-utility’ profile — and thus to escape liability [under New Hampshire law] — was to *390 strengthen ‘the presence and efficacy’ ” of the drug’s warning. Id. But the warnings provided for a generic drug must be the same as the warnings found in the labeling approved for the brand-name drug in order to gain approval by the FDA. Mensing, 131 S.Ct. at 2574. As a result, the generic manufacturer could not possibly comply with both state and federal laws. Bartlett, 133 S.Ct. at 2477.
In reaching this conclusion, the Supreme Court rejected the First Circuit’s “stop-selling” rationale as a basis for finding that the generic manufacturer could comply with both state and federal laws, stating that the Court’s “pre-emption cases presume that an actor seeking to satisfy both his federal-and state-law obligations is not required to cease acting altogether to avoid liability.” Id. at 2477. Such a narrow reading would render the impossible-to-comply preemption doctrine “all but meaningless.” Id. (internal quotation marks omitted). “Adopting the First Circuit’s stop-selling rationale would mean that ... the vast majority — if not all — of the cases in which the Court has found impossibility pre-emption[ ] were wrongly decided.” Id. at 2478. The Court therefore held that “state-law design-defect claims that turn on the adequacy of a drug’s warnings are pre-empted by federal law under [Mensing ].” Id. at 2470.
Perhaps acknowledging that its preemption jurisprudence might be viewed as unjust because it bars plaintiffs from recourse against generic manufacturers, the Court stated:
Suffice to say, the Court would welcome Congress’ “explicit” resolution of the difficult pre-emption questions that arise in the prescription drug context. That issue has repeatedly vexed the Court— and produced widely divergent views— in recent years_[T]he FDCA’s treatment of prescription drugs includes neither an express pre-emption ■ clause (as in the vaccine context, 42 U.S.C. § 300aa-22(b)(l)), nor an express non-pre-emption clause (as in the over-the-counter drug context, 21 U.S.C. §§ 379r(e), 379s(d)). In the absence of that sort of “explicit” expression of congressional intent, we are left to divine Congress’ will from the duties the statute imposes.
Id. at 2480. This invitation for congressional action echoes the one in Mensing. See 131 S.Ct. at 2582.

3. Failure-to-warn claims

The relevant preemption question after Mensing is whether a generic manufacturer can simultaneously comply with both its state and federal duties. See id. at 2577. Mensing considered Louisiana and Minnesota laws that “require a drug manufacturer that is or should be aware of its product’s danger to label that product in a way that renders it reasonably safe.” Id. at 2573. Louisiana law states that “a manufacturer’s duty to warn includes a duty to provide adequate instructions for safe use of a product.” Id. (internal quotation marks omitted). Minnesota law similarly states that “where the manufacturer ... of a product has actual or constructive knowledge of danger to users, the ... manufacturer has a duty to give warning of such dangers.” Id. (internal quotation marks omitted) (alterations in original). That is, “[i]n both States, a duty to warn falls specifically on the manufacturer.” Id. In the two consolidated cases before the Supreme Court, the parties admitted that if the generic manufacturers knew of a danger associated with their product that their labels did not adequately warn of, then they were obligated under state law to “use [ ] different, safer label[s].” Id. at 2574.
*391 The plaintiffs in the present case read Mensing narrowly and argue that the Supreme Court’s decision was based on' the fact that Louisiana and Minnesota laws “would require a manufacturer to actually change the content of its label” — that is, “provide different, additional warnings.” They further contend that, under Mens-ing, only claims “based on the adequacy of the information contained in the drug’s label” are preempted, not claims based on “a manufacturer’s duty to provide a warning” beyond the label. The Generic Manufacturers, they argue, “could have sought FDA approval for a labeling change, or they could have notified health care professionals by other means, or could have ceased selling their products but chose not to do so.” In particular, they argue that the Generic Manufacturers, on their own initiative, could have distributed “Dear Health Care Professional” or “Dear Doctor” letters to medical professionals to warn them of the dangers of metoelopram-ide that were not adequately communicated on the drug’s label. Finally, they argue that generic manufacturer PLIVA failed-to update its labels to include information found on the labels of Reglan as of 2004.
The plaintiffs’ narrow reading of Mens-ing has been soundly rejected by all circuits to consider the argument. These circuits have interpreted Mensing to broadly preempt claims that are, at their core, claims that the generic manufacturer failed to provide additional warnings beyond that which was required by federal law of the brand-name manufacturers. See Schrock v. Wyeth, Inc., 727 F.3d 1273, 1287-90 (10th Cir.2013) (holding that federal law preempts breach-of-warranty claims premised on a theory that generic manufacturers provided improper descriptions or warnings); Guarino v. Wyeth, LLG, 719 F.3d 1245, 1247-49 (11th. Cir.2013) (holding that the plaintiffs state-law claims against the generic manufacturer for not “adequately warning] medical providers of the risks associated with long-term use of metoclopramide” were all claims “premised upon an allegedly inadequate warning” and therefore preempted under Mensing); Bell v. Pfizer, Inc., 716 F.3d 1087, 1095-96 (8th Cir.2013) (rejecting the plaintiffs argument that Mensing’s preemption analysis “applies only to allegations that a generic manufacturer should have unilaterally changed the content of its metoclopramide label,” finding this to be an “unduly narrow view of Mensing ” and holding that the plaintiffs claims for negligence and misrepresentation under the Arkansas Product Liability Act were “preempted failure to warn claims” (emphasis omitted)); Mortis v. PLIVA, Inc., 713 F.3d 774, 777 (5th Cir.2013) (per cu-riam) (holding that “Mensing forecloses such [failure-to-communicate] claims because failure to ‘communicate’ extends beyond just a label change” and includes “affirmative steps to alert consumers, doctors, or pharmacists of changes in the drug label,” actions that the generic manufacturer is prohibited from taking unilaterally under federal law); see also Gaeta v. Perrigo Pharm. Co., 469 Fed.Appx. 556 (9th Cir.2012), aff'g 562 F.Supp.2d 1091 (N.D.Cal.2008) (granting summary judgment in favor of the generic manufacturer of over-the-counter ibuprofen because the plaintiffs state-law claims for negligence, breach of express warranty, and breach of implied warranty based on an inadequate warning were preempted). Furthermore, the plaintiffs conceded at oral argument that the majority of their claims do not survive after Bartlett.
We may not, of course, rest our holding on such broad language from other circuits, but must evaluate the plaintiffs’ claims in light of Tennessee law. As the district court correctly noted,
*392 [t]he TPLA governs products liability actions in Tennessee and defines “product liability action[s]” as “all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packing, or labeling of any product.” The TPLA also encompasses several different theories of products liability: “strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory in tort or contract whatsoever.”
Strayhorn v. Wyeth Pharm., Inc., 887 F.Supp.2d 799, 813 (W.D.Tenn.2012) (internal footnotes omitted). The TPLA governs all of the plaintiffs’ claims because the claims were brought for or on account of personal injury resulting from the design, warning, instruction, marketing, packaging, and labeling of metoclopramide. See, e.g., Richardson v. GlaxoSmithKline, 412 F.Supp.2d 863, 868 (W.D.Tenn.2006) (stating that although the plaintiffs complaint for personal injuries against a drug manufacturer under the theories of negligence, strict liability, and breach of warranty “does not cite the specific basis for his allegations, product liability suits in Tennessee are governed by the Tennessee Products Liability Act”). A manufacturer or seller of a product in Tennessee “shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.” Tenn.Code Ann. § 29-28-105(a).
Under the TPLA, a product is deemed defective when it is in a condition “that renders it unsafe for normal or anticipatable handling and consumption.” Id. § 29-28-102(2). In contrast, a product is considered unreasonably dangerous if it is
dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or [if] the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition. .
Id. § 29-28-102(8). The TPLA provides two tests to determine whether a product is unreasonably dangerous: the consumer-expectation test and the prudent-manufacturer test. Under the consumer-expectation test, a product is deemed unreasonably dangerous if it would be “dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.” Ray by Holman v. BIC Corp., 925 S.W.2d 527, 530 (Tenn.1996) (internal quotation marks omitted).
“[T]he prudent manufacturer test,” on the other hand, “requires proof about the reasonableness of the manufacturer or seller’s decision to market a product assuming knowledge of its dangerous condition.” Id. at 531. The two tests are not mutually exclusive; either or both might be applicable to cases where the product is alleged to be unreasonably dangerous, but “the prudent manufacturer test will often be the only appropriate means for establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation.” Id.
*393 With respect to the duty to warn, the Tennessee Supreme Court has stated that
Manufacturers of prescription drugs, like the manufacturers of any other unavoidably dangerous product, have a duty to market and distribute their products in a way that minimizes the risk or danger. They may discharge their duty by distributing the drugs with proper directions and adequate warnings to those who foreseeably could be injured by the use of their products.... Warnings concerning prescription drugs generally are adequate when they contain a full and complete disclosure of the potential adverse reactions to the drug. A reasonable warning not only conveys a fair indication of the dangers involved, but also warns with the degree of intensity required by the nature of the risk.
Pittman v. Upjohn Co., 890 S.W.2d 425, 428, 429 (Tenn.1994). Tennessee law thus appears to track the laws of Louisiana and Minnesota discussed in Mensing, which impose a similar duty on the manufacturer to warn of known dangers associated with its product. See PLIVA Inc. v. Mensing, -U.S. --- 131 S.Ct. 2567, 2573-74, 180 L.Ed.2d 580 (2011).
In the present case, the plaintiffs essentially argue that the Generic Manufacturers have a duty to warn under state law, ignoring the limitations imposed on that duty by the federal labeling requirements. See Am. Compl. Count I-Strict Liability, ¶ 57 (“Each of the ... defendants is liable under the common law and/or Product Liability Act for ... failure to give adequate warnings and/or to effectively communicate adequate warnings ... bearing on the ... foreseeable uses of the specific meto-clopramide product....); Count Ill-Negligence, ¶ 87b (’’[Defendants] failed to use ordinary care in marketing, labeling, and communicating adequate warnings about their respective products....); Count V-Fraud, Misrepresentation, and Suppression, ¶ 99 (“Defendants are liable [for] willful and fraudulent misrepresentations to physicians[ ] regarding the safety, efficacy, and risk/benefit ratio” of the drugs); Count VII-Breach of Express and Implied Warranties, ¶ 123 (“[Defendants] fail[ed] to deliver products that were safe for their intended uses ... in light of the substantially greater risk of dangerous side effects associated with its ordinary and expected uses ... than disclosed and warranted in the product label and/or other advertising and promotional representations.”); Count Xl-Civil Conspiracy, ¶ 153 (“Defendants acted with a common purpose to intentionally and/or fraudulently withhold information from the medical pommunity and physicians regarding the safety of’ the drugs).
A few recent decisions have permitted claims similar to these to go forward. Two such decisions were issued on the same day by the Pennsylvania Superior Court in Hassett v. Dafoe, 74 A.3d 202 (Penn.Super.Ct.2013), and in In re Reglan/Metoclopramide Litig., 81 A.3d 80, 2013 WL 3874905 (Penn.Super.Ct. July 29, 2013). The majority opinion in both cases discounted “the 'tsunami of [federal] cases applying Mensing to pre-empt virtually all state tort claims against generic manufacturers,” criticizing those decisions for their general failure to explicitly identify “state law duties associated with various causes of action” and explain “how they conflict with federal law.” Hassett, 74 A.3d at 211-12 (internal quotation marks omitted).
In particular, the Pennsylvania court majority discussed claims for breach of express and implied warranties and for fraud and misrepresentation. It stated that the claims for breach of express and implied warranties sought to impose liability “for failing to deliver products that conformed to the properties described in the label and promotional materials,” and that *394 such claims were “not premised on the inadequacy of the label but rather on the product’s failure to live up to or conform to its label and advertising.” Id. at 215. Advertising and promotional materials did not fall into the FDCA’s definition of “labeling,” the majority further reasoned. Id. The claims were therefore not deemed preempted.' With respect to the fraud and misrepresentation claims, the majority found that these claims were also not preempted because the plaintiff pled that the generic manufacturers fraudulently misrepresented the safety of the drugs “in their advertising and promotional materials, not just [on] .their labels.” Id.
Although the Pennsylvania court majority criticized the federal courts for not engaging in a nuanced comparison of federal and state duties, the dissent pointed out that the majority “offer[ed] virtually no state statutory or caselaw ... in support of its conclusion that Appellees have presented allegations of state law tort claims which survive preemption.” Id. at 220 (Platt, J., concurring in part and dissenting in part). We are obviously not bound by the majority opinion of the Pennsylvania Superior Court, and the omission pointed out by. the dissent undermines the persuasive force of these outlier cases.
Moreover, we reject as unpersuasive the Pennsylvania Superior Court’s reasoning that breach-of-warranty claims avoid federal preemption to the extent that they are “not premised on the inadequacy of the label but rather on the product’s failure to live up to or conform to its label and advertising.” Hassett, 74 A.3d at 215. Under the FDCA, “labeling” embraces “all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.” 21 U.S.C. § 321(m). The Supreme Court has held that the first clause “clearly embraces advertising or descriptive matter that goes with the package in which the articles are transported.” Kordel v. United States, 335 U.S. 345, 349-50, 69 S.Ct. 106, 93 L.Ed. 52 (1948). With respect to the second clause, “[o]ne article or thing is accompanied by another when it supplements or explains it.... No physical attachment one to the other is necessary.” Id. Furthermore, the Code of Federal Regulations includes brochures, booklets, mailings, catalogues, films, sound recordings, and literature, among other things, in the definition of “labeling.” 21 C.F.R. § 202.1(i)(2). Such labeling must be consistent with the drug’s approved labeling. 21 C.F.R. § 201.100(d)(1); see also 21 C.F.R. § 202.1(e)(4) (prohibiting advertisements that “recommend or suggest” any use that is not in the labeling approved by the FDA).
Because such advertising and promotional materials are considered labeling, and because labeling is limited by federal law to the information contained in the brand-name drug’s labeling, all of the warranty claims against the Generic Manufacturers based on these materials are preempted under Mensing. This follows from the fact that the Generic Manufacturers cannot meet their alleged state-law duty to provide an adequate warning without violating their federal duty of conformity to the Reglan label. See PLIVA, Inc. v. Mensing, — U.S.-, 131 S.Ct. 2567, 2577-78, 180 L.Ed.2d 580 (2011).
Somewhat closer to home are two recent decisions by the Eighth Circuit Court of Appeals, which remanded design-defect and breach-of-warranty claims for reconsideration. One of these decisions is Bell v. Pfizer, 716 F.3d 1087 (8th Cir.2013), where the court determined that the “vast majority” of Bell’s allegations were essentially “preempted failure to warn claims” based on inadequate warning or labeling, but it remanded for reconsideration the *395 design-defect and breach-of-implied-warranty claims that appeared not to be based on the warnings. Id. at 1096. The district court had simply construed all the claims as failure-to-warn claims and had not analyzed whether the plaintiffs “adequately state[d] viable claims under Arkansas law” or whether the claims were barred by “impossibility preemption.” Id. And in Fullington v. Pfizer, 720 F.3d 739 (8th Cir.2013), the Eighth Circuit remanded the plaintiffs design-defect claim for reconsideration in light of Bartlett because, under Arkansas’s consumer-expectation test, “it [was] not immediately clear” whether generic drug manufacturers in that state could “somehow alter an otherwise unreasonably dangerous drug” without running afoul of federal law. Id. at 747.
In the present case, we find no similar inadequacy of analysis by the district court. We also conclude, unlike the Eighth Circuit in Bell and Fullington, that the plaintiffs’ implied-warranty claims boil down to the failure to give additional warnings. The plaintiffs allege that the Generic Manufacturers “fail[ed] to deliver products that were safe for their intended uses, including long term metoclopramide therapy, in light of the substantially greater risk of dangerous side effects associated with its ordinary and expected uses, including long term therapy, than disclosed and warranted in the product label and/or other advertising and promotional materials.” Am. Compl. ¶ 123. These claims are clearly based on the alleged inadequacy of the warnings given.
Before further analyzing the plaintiffs’ implied-warranty claims, we note that their express-warranty claims are without merit because the labels never explicitly warranted that metoclopramide was safe for long-term use. In fact, the plaintiffs do not allege that the Generic Manufacturers ever made such an affirmative representation; they instead allege that the labeling failed to strongly warn that the product was not appropriate for such use. See Am. Compl. ¶¶ 13-15 (“The ‘indications’ (recommended uses) listed in the product labeling for Reglan/metoclopram-ide include adult short-term therapy ... for up to twelve (12) weeks in adults, for gastroesophogeal reflux (heartburn), and specified no durational limit in therapy for gastric stasis or gastroparesis (bloating) .... [But the drug has never] been shown to be either efficacious or safe when used for long term treatment.”); ¶¶ 33-34 (“The defendants failed to adequately inform physicians ... about the risks associated with ... metoclopramide ... [and therefore] Plaintiffs’ physicians did not know or appreciate fully the risks of side affects associated with the use, particularly with the long term use, of the drug.”)
In order to establish a prima facie claim -for breach of express warranty in Tennessee, a plaintiff must prove that: (1) the seller made an affirmation of fact intending to induce the buyer to purchase the goods, (2) the buyer was in fact induced by the seller’s acts, and (3) the affirmation of fact was false regardless of the seller’s knowledge of the falsity or intention to create a warranty. Coffey v. Dowley Mfg., Inc., 187 F.Supp.2d 958, 969 (M.D.Tenn.2002), aff'd, 89 Fed.Appx. 927 (6th Cir.2003). The plaintiffs’ allegations in the present case do not identify any affirmation of fact made on the product labeling that they allege to be false; rather, they allege that the labeling was inadequate. We thus find no merit in their express-warranty claims.
The plaintiffs’ implied-warranty claims under Tenn.Code Ann. § 47-2-314 fare no better because they are entirely premised on a failure-to-warn theory. In particular, the plaintiffs do not allege that the generic metoclopramide they took was *396 ineffective for treating the gastrointestinal conditions for which it was prescribed; only that it was unsafe when used long-, term because of the drug’s dangerous side effects. See Am. Compl. ¶ 15. Any long-term use, they further allege, was due to the Generic Manufacturers’ failure to warn about the consequences of such use. Id. ¶ 31. Indeed, the plaintiffs allege that the Generic Manufacturers delivered products that were “[un]safe for their intended uses ... in light of ... the product label and/or other advertising or promotional representations.” Id. ¶ 123 (emphasis added). In order to escape liability for such an alleged defect, the Generic Manufacturers would have had to give a stronger warning than they were permitted to give under federal law. But such implied-warranty claims are preempted by both Mensing and Bartlett.
To the extent that the plaintiffs allege that the Generic Manufacturers should have unilaterally changed the label to reflect any danger posed by long-term use of the drug, this claim is clearly preempted. See PLIVA, Inc. v. Mensing, - U.S. -, 131 S.Ct. 2567, 2578, 180 L.Ed.2d 580 (2011). And to the extent that the plaintiffs allege that the drug itself should have been modified to conform to the properties described in the label, generic manufacturers are prohibited by their federal duty of sameness froin designing their drugs differently from the RLD. See Mut. Pharm. Co. v. Bartlett, — U.S. -, 133 S.Ct. 2466, 2475, 186 L.Ed.2d 607 (2013) (noting that “the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based”). When a generic manufacturer cannot obey federal law without being held liable under a state-law warranty action, the state action is preempted. See Mens-ing, 131 S.Ct. at 2577.
Our conclusion is consistent with this court’s previous decision in Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011), cert. denied,— U.S.-, 132 S.Ct. 2103, 182 L.Ed.2d 868 (2012), which affirmed the district court’s determination that the plaintiffs’ state-law claims — centering on a failure to warn under Kentucky law that included claims for breach of implied warranty — were preempted. We further note that Kentucky’s implied-warranty regime is substantially the same as that, of Tennessee. Compare Ky.Rev.Stat. § 355.2-314 with TenmCode Ann. § 47-2-314. To not find preemption in the present case would require us to disregard this court’s binding precedent.
Nor does the Pennsylvania Superior Court’s evaluation of the fraud and misrepresentation claims in Hassett help the plaintiffs in the present case. As an initial matter, the plaintiffs’ allegations with respect to these claims appear to relate only to the Brand-Name Manufacturers. See Am. Compl. ¶ 100 (“Through its [sic] actions and omissions in advertising and other activities to promote the use of Reglan, defendants intentionally and fraudulently made ■ misrepresentations of material facts....”); ¶ 105 (“BRAND NAME DEFENDANTS made these material misrepresentations and omissions to physicians knowing that they were not true, and knowing and intending that physicians would consider the misinformation disseminated to be reliable....”); ¶ 106 (“In the alternative, BRAND NAME DEFENDANTS made the false material representations and omissions with reckless disregard of whether these representations were true or not.”); ¶ 110 (“BRAND NAME DEFENDANTS overstated the benefits and safety of Reglan and concomi *397 tantly downplayed the - risks in its use....”).
But even if the complaint is read to assert these claims against the Generic Manufacturers, the claims boil down to an alleged duty to provide additional information about generic metoclopramide. See Am. Compl. ¶ 108 (“Each of the DRUG COMPANY DEFENDANTS ... is obligated to give physicians and their patients ... accurate and material scientific information and data regarding the association between exposure to metoclopramide and the [risks of the drug].”); ¶ 111 (“The DRUG COMPANY DEFENDANTS passively assented to and indirectly cooperated in the misrepresentations, concealment, suppression and omissions made directly by the BRAND NAME DEFENDANTS .... ”). These claims are essentially failure-to-warn claims that are preempted under Mensing.
The plaintiffs’ design-defect claims suffer a similar fate under Bartlett because all of their claims rest on inadequate warnings. Although Tennessee caselaw has not yet addressed whether the prudent-manufacturer test or the consumer-expectation test applies to design-defect claims involving prescription drugs, the former test would appear to be the appropriate choice in this case because the ordinary consumer would not have the medical knowledge necessary to have a reasonable expectation about the safety of metoclopramide. See Ray by Holman v. BIC Corp., 925 S.W.2d, 527, 531 (Tenn.1996) (“By definition, [the consumer-expectation test] could be applied only to those products in which everyday experience of the product’s users permits a conclusion. For example, ordinary consumers would have a basis for expectations about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag.” (ellipsis, emphasis, internal citation,' and internal quotation marks omitted)).
In analyzing whether a product is unreasonably dangerous under Tennessee’s prudent-manufacturer test, the court engages in a risk-utility analysis similar to New Hampshire’s by considering
(1) the product’s usefulness and desirability; (2) the product’s safety aspects— the likelihood and probable seriousness of injury; (3) the availability of a substitute product that would safely meet the same need; (4) the manufacturer’s ability to eliminate the product’s unsafe character without hindering its usefulness or causing the maintenance of its utility to be too expensive; (5) the ability of the operator or user to avoid danger through the exercise of care in using the product; (6) the user’s anticipated awareness of the product’s inherent dangers and their avoidability; and (7) the feasibility of the manufacturer spreading the loss by setting the price of the product or maintaining liability insurance.
Brown v. Crown Equip. Corp., 181 S.W.3d 268, 282-83 (Tenn.2005). The Supreme Court in Bartlett considered factors such as these to effectively require either a redesign of the product or a stronger warning to avoid liability for a design defect, with neither course of action being available to a generic manufacturer under federal law. See Mut. Pharm. Co. v. Bartlett, — U.S. -, 133 S.Ct. 2466, 2475-76, 186 L.Ed.2d 607 (2013). In any event, we need not decide which test applies in the present case because the plaintiffs conceded at oral argument that Bartlett forecloses their design-defect claims.
We next turn to the plaintiffs’ argument that the Generic Manufacturers should have sent Dear Doctor letters to communicate additional warnings. Such letters, however, would violate the duty of *398 conformity, as explained in PLIVA, Inc. v. Mensing, — U.S. -, 131 S.Ct. 2567, 2576, 180 L.Ed.2d 580 (2011):
A Dear Doctor letter that contained substantial new warning information would not be consistent with the drug’s approved labeling. Moreover, if generic drug manufacturers, but not the brand-name manufacturer, sent such letters, that would inaccurately imply a therapeutic difference between the brand and generic drugs and thus could be imper-missibly “misleading.” [ ] [S]ee 21 CFR § 314.150(b)(3) (FDA may withdraw approval of a generic drug if “the labeling of the drug ... is false or misleading in any particular”).... Accordingly, we conclude that federal law did not permit the Manufacturers to issue additional warnings through Dear Doctor letters.
See also Fulgenzi v. PLIVA, Inc., 711 F.3d 578, 581 n. 1 (6th Cir.2013) (noting that the term “labeling” is broadly construed and includes Dear Doctor letters).
As the Fifth Circuit recently explained, “the inquiry is whether the brand-name manufacturers sent out a warning, not whether the proposed warning to be disseminated contains substantially similar information as the label. Because no brand-name manufacturer sent a warning based on the 2004 label change, the generic manufacturers were not at liberty to do so.” Morris v. PLIVA, Inc., 713 F.3d 774, 777 (5th Cir.2013) (per curiam). Nor can the plaintiffs proceed on a failure-to-withdraw or stop-selling theory, a theory recently rejected by the Supreme Court in Bartlett.
Finally, the plaintiffs argue that Mens-ing does not control, and that their claims instead survive preemption under Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005), and Altria Group, Inc., v. Good, 555 U.S. 70, 129 S.Ct. 538,172 L.Ed.2d 398 (2008). These latter cases involved federal statutes that expressly preempt certain state-law failure-to-warn claims, but leave available other state-law causes of action such as express warranty, conspiracy, and design defect.
But express preemption is not at issue in the present case. The Supreme Court clearly based its decision in Mensing on conflict or impossibility preemption, which requires a comparison of the conflicts between state and federal duties to determine “whether the private party could independently do under federal law what state law requires of it.” Mensing, 131 S.Ct. at 2579. Simply because certain claims survived express preemption in other cases does not mean that they will survive conflict preemption in this case. See id. at 2577 n. 5 (“[T]he absence of express pre-emption is not a reason to find no conflict pre-emption.” (emphasis in original)). The plaintiffs’ attempt to avoid Mensing by analogizing their claims to the express-preemption cases is therefore unavailing. We find no error in the district court’s dismissal of the plaintiffs’ claims that are, at their core, all failure-to-warn claims.

4. Failure-to-conform claims

In their complaint, the plaintiffs alleged that several of the Generic Manufacturers “were negligent in failing to include information present in the label for the RLD and in failing to implement changes to their own labels to ensure that the information they provided was current and not outdated” and, in some cases, “waited years to conform their labels to the RLD label.” Am. Compl. ¶ 87 l. And in the plaintiffs’ brief on appeal, they argue that “PLIVA failed to include instrumental warnings in its label for método- *399 pramide that had been approved by the FDA and were in use by the name brand manufacturers in their FDA approved labeling.” The district court - characterized these allegations as “failure-to-conform claims.” Other courts refer to claims of this nature as “failure-to-update claims.”
In Fulgenzi v. PLTVA, Inc., 711 F.3d 578 (6th Cir.2013), this court held that the plaintiff stated a claim by alleging that the generic manufacturer failed to update its label in 2004 to match that of the prescription drug Reglan. The court held that the claim was not barred by the impossibility-preemption doctrine because the generic manufacturer could have complied with federal law by using the same label as the brand-name manufacturer (and in fact was required to do so). Fulgenzi, 711 F.3d at 584. Because the claim survived preemption, Fulgenzi was free to argue that the outdated warning was inadequate. That decision, however, is based on facts clearly distinguishable from the present case.
The plaintiff in Fulgenzi alleged that “in July of 2004, the FDA approved Schwarz’s request to add a sentence to the Reglan label as follows: ‘Therapy should not exceed 12 weeks in duration.’ Consequently, the name brand warning label for Reglan contained the foregoing warning against treatment in excess of 12 weeks after this date.” Fulgenzi v. PLTVA, Inc., No. 5:09-cv-1767, Second Am. Compl. (D.E.60) ¶ 46. Fulgenzi amended her complaint after Mensing to include a claim that PLI-VA, the generic manufacturer, “failed to update its ... label(s) as to metoclopram-ide to include the July, 2004 label change warning against any therapy in excess of 12 weeks.” Id.- ¶ 60. She also specifically alleged that she ingested PLIVA-manufac-tured metoclopramide during the time when the generic’s label was not updated, i.e., “September, 2004; September, 2006; December, 2006; March, 2007; June, 2007; and August, 2007,” id. ¶ 17, allowing this court to conclude that “PLIVA’s label was not updated the entire time Fulgenzi was prescribed the drug,” Fulgenzi, 711 F.3d at 582.
In the present case, nothing in the complaint indicates when the plaintiffs ingested generic metoclopramide. They simply allege that “several” of the Generic Manufacturers “fail[ed] to include information present in the label for the RLD and fail[ed] to implement changes to their own labels,” and that some Generic Manufacturers “waited years to conform their labels to the RLD label.” Am. Compl. ¶ 87 l. The plaintiffs attempt to enlarge their pleadings on appeal by arguing that “PLIVA failed to include instrumental warnings in its label for metoclopramide that had been approved by the FDA and were in use by the name brand manufacturers in their FDA approved labeling.” But “[t]he appropriate method for adding new factual allegations to a cornplaint is not via an appellate brief, but by filing an amended complaint.” Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 328 (6th Cir.2006). Moreover, these new statements still fail to allege when the metoclopramide was ingested and by whom it was used with regard to specific generic manufacturers, facts essential to show that a particular generic manufacturer’s label was not updated during the time that a particular plaintiff was using its product.
In evaluating whether a complaint states a claim for relief, we “should not assume facts that were not pled.” Id. at 328. We will instead consider “only those facts alleged in [the plaintiffs’] complaint and the reasonable inferences that can be drawn from those facts.” Id. at 329. So even assuming that the failure-to-conform claims are not preempted under Fulgenzi, the plaintiffs have nonetheless failed to “state a claim to relief that is plausible on *400 its face,” see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); see also Bowman v. Wyeth, LLC, No. 10-1946, 2012 WL 684116, at *7 (D.Minn. Mar. 2, 2012) (declining to reach the question whether the failure-to-conform claim was preempted because the plaintiffs complaint did not allege that he ingested metoclopramide after July 2004 or that he ingested metoclo-pramide for more than twelve weeks, nor did it allege any specific facts relating to the 2004 labeling change).
The plaintiffs requested at oral argument an opportunity to amend their complaint once more in light of Fulgenzi, but they have offered no argument as to why they were unable to include the dates during which they took the drugs in their first amended complaint. Contrary to the plaintiffs’ assertion at oral argument that such information need not be in the complaint, such a factual averment is critical to the question of whether the plaintiffs’ alleged injuries are in any way connected to the alleged failure to conform.
The plaintiffs are responsible for pleading their cause of action and are “not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.” Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 573 (6th Cir.2008) (brackets and internal quotation marks omitted). This is especially true here, where the plaintiffs were already given leave to amend their complaint once and where the key facts that might make their claims plausible are easily within their own knowledge. We therefore find no error in the district court’s dismissal of the plaintiffs’ failure-to-eon-form claims.

5. Civil conspiracy

In their brief on appeal, the plaintiffs argue that they have adequately pled a cause of action for civil conspiracy. The district court held that the plaintiffs had not alleged any facts in support of their civil-conspiracy claim, and that such a claim was in substance another failure-to-warn claim. We find no error'in the district court’s analysis. The plaintiffs’ complaint with regard to this claim does no more than recite the elements of a cause of action for civil conspiracy; on appeal, they simply reiterate their pleadings. Because “[t]hreadbare recitals of the elements of a cause of action, supported by mere conelu-sory statements, do not suffice” to state a claim, Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the complaint fails to state a claim for civil conspiracy. Moreover, even if the civil-conspiracy claim was adequately supported by factual allegations, the essence of such a claim is that there was a tacit agreement between the manufacturers not to warn, or not to adequately warn, about the dangers of long-term metoclopramide use — a failure-to-warn claim that, for the reasons already discussed, is preempted under Mensing.

6. Punitive damages

The plaintiffs further argue that “Mensing clearly does not mandate dismissal of the punitive damages claim as to -the Generic Defendants.” But their claims for punitive damages are “derivative in nature.” See Graham v. Am. Cyanamid Co., 350 F.3d 496, 514-15 (6th Cir.2003). “A derivative cause of action may not provide greater relief than that available under the primary cause of action.” Id. at 515 (internal citation omitted). Because the district court did not err in dismissing the plaintiffs’ substantive claims against the Generic Manufacturers, it did not err in dismissing their punitive-damages claims.
*401 C. Claims against the Brand-Name Manufacturers
Turning now to the Brand-Name Manufacturers, the plaintiffs contend that the information disseminated by them was “materially false, incomplete, and misleading” and that this deficiency proximately caused the plaintiffs’ injuries. They assert that the Brand-Name Manufacturers had an affirmative duty under the FDA regulations to accurately label their products because a medical professional could foreseeably rely on that information in prescribing metoclopramide, the generic equivalent of Reglan. The Brand-Name Manufacturers respond that none of the plaintiffs took Reglan, only the generic metoclopramide, so the plaintiffs’ claims against them are barred by the TPLA.
Agreeing with the Brand-Name Manufacturers, the district court held that the plaintiffs, who conceded that they never took Reglan, could not meet the “threshold requirement” of a Tennessee products-liability claim — i.e., “that the plaintiff assert that the defendant’s product caused the plaintiffs injury.” Stmyhom v. Wyeth Pharm., Inc., 882 F.Supp.2d 1020, 1029 (W.D.Tenn.2012). The court found that Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011), cert. denied — U.S.-, 132 S.Ct. 2103, 182 L.Ed.2d 868 (2012), a decision involving Kentucky law, controlled the present case.
The Smith plaintiffs sued Wyeth and Schwarz, both makers of Reglan, alleging fraud and tortious misrepresentation. Examining the Kentucky Product Liability Act (KPLA), this court noted that the Act “defines a product liability action as any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation[,] ... warning, instructing, marketing, advertising, packaging' or labeling of any product.” Id. at 423 (internal quotation marks omitted) (second alteration in original). This court further noted that the Kentucky Supreme Court had held that the KPLA “applies to all damages claims arising from the use of products, regardless of the legal theory advanced.” Id. (internal quotation marks omitted). Kentucky law also requires that the plaintiffs assert, as a threshold matter, “that the defendant’s product caused the plaintiffs injury.” Id. But the Smith plaintiffs, just as the plaintiffs in the present case, had ingested only generic metoclopramide, not Reglan.
This court in Smith also rejected the plaintiffs’ argument that “the name-brand defendants’ liability stems from the fact that the regulatory structure governing name-brand and generic drugs makes it foreseeable that patients and their physicians will rely on the name-brand labels to use and prescribe generic drugs.” Id. at 423-24. It noted that the “leading case” on this issue, Foster v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994), held that “the manufacturer of a name-brand drug has no duty to patients who ingested only a generic version of the drug manufactured by the name-brand drug company’s competitors.” Smith, 657 F.3d at 424. This court therefore joined “the majority of courts to address this. question” and held that the plaintiffs could not bring their state-law tort claims against the brand-name defendants. Id.
The plaintiffs’ arguments in the instant case track those of the'Smith plaintiffs. They contend that- their' suit is not governed by the TPLA and that they have stated viable causes of action for negligent and fraudulent misrepresentation and for breach of express and implied warranties under Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (finding no preemption against the brand-name *402 manufacturer), and Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299 (2008) (holding that an injured plaintiff may hold a brand-name manufacturer liable for its alleged misrepresentations even though the actual injury was caused by a generic manufacturer’s drug). That is, they focus their arguments on whether the TPLA- even applies to them. The plaintiffs do not challenge the district court’s dismissal of their remaining claims against the Brand-Name Manufacturers.
Unfortunately for the plaintiffs, the relevant language in the TPLA is essentially the same as the language of the KPLA discussed in Smith. Both statutes define a “product liability action” to include all harm caused by a product regardless of the legal theory advanced. Compare Tenn.Code Ann. § 29-28-102(6) with Ky. Rev.Stat. § 411.300(1).
The TPLA’s definition of “product liability action” has been interpreted broadly. See, e.g., Richardson v. GlaxoSmithKline, 412 F.Supp.2d 863 (W.D.Tenn.2006) (concluding that although the plaintiffs complaint for personal injuries against a drug manufacturer under the theories of negligence, strict liability, and breach of warranty “does not cite the specific basis for his allegations, product liability suits in Tennessee are governed by the Tennessee Products Liability Act”); Spence v. Miles Labs., Inc., 810 F.Supp. 952, 959 (E.D.Tenn.1992) (“Whether formulated as a ‘strict liability’ claim- for damages resulting from untested blood products ... or as a negligence claim, the plaintiffs claims, manifestly relate to a product [and] clearly fall within Tennessee’s broad definition of products liability actions.”), aff'd, 37 F.3d 1185 (6th Cir.1994); Penley v. Honda Motor Co., 31 S.W.3d 181 (Tenn.2000) (applying the. TPLA to the -plaintiffs express- and implied-warranty claims for injuries caused by an all-terrain vehicle).
As. relevant to the present case, the TPLA clearly applies to the plaintiffs’ claims for breach of warranty against the Brand-Name Manufacturers. And although the definition of a “product liability action” does not explicitly state whether fraudulent misrepresentation claims are covered, see Tenn.Code Ann. § 29-28-102(6) (stating that the TPLA covers claims for “misrepresentation, concealment, or nondisclosure, whether negligent, or innocent”), we conclude that such a cause of action is fairly encompassed in the catch-all provision of this section, see id. (stating that a “product liability action” includes “any other substantive legal theory in tort or contract whatsoever”).
The plaintiffs’ injuries allegedly caused by the Brand-Name Manufacturers’ purported fraudulent misrepresentations in the present case are the result of the Brand-Name Manufacturers’ “advertising, promotions, in-office and group presentations[,] ... sponsored education and continuing education programs and seminar speakers, the planning, sponsorship, ghostwriting, and arranged publication of nonscientific and misleading medical research,” as well as their failure to warn the medical community about the true risks of Reglan. See Am. Compl. ¶¶ 101-03. In other words, they are the result of the “warning, instruction, marketing, packaging or labeling of’ Reglan. See Tenn.Code Ann. § 29-28-102(6).
These are essentially the same allegations made against the brand-name manufacturers in Smith. See Smith v. Wyeth, Inc., No. 5:07-CV-18-R, 2008 WL 2677051, at *3 (W.D.Ky. June 30, 2008) (“Specifically, Plaintiff argues that Defendants distributed false and misleading information concerning Reglan.... In effect, Plaintiff is arguing that Defendants’ warning, labeling, and marketing concerning Reglan should also be seen as the *403 warning, labeling, and marketing of [competing generic manufacturers].” (emphasis added)). We thus conclude that the TPLA applies to all of the plaintiffs’ claims against the Brand-Name Manufacturers. This determination is consistent with the determination in Smith that the - KPLA covers product-liability actions for fraud and misrepresentation despite the lack of any specific language to that effect in the statute. See Smith v. Wyeth, Inc., 657 F.3d 420, 423 (6th Cir.2011), cert. denied — U.S. —, 132 S.Ct. 2103, 182 L.Ed.2d 868 (2012) (holding that the KPLA “applies to all damages claims arising from the use of products, regardless of the legal theory advanced”) (internal quotation marks omitted).
Similar to the KPLA, the TPLA contains multiple references to manufacturers and sellers. See TenmCode Ann. § 29-28-102(4), (7) (defining the terms “manufacturer” and “seller”); § 103(a) (setting forth the statute of limitations for “[a]ny action against a manufacturer or seller of a product for injury to person”); § 104(a) (discussing the rebuttable presumption that a product is not unreasonably dangerous if the manufacturer or seller complied with federal and state regulations). These references fairly imply that a claim falling under the definition of a “product liability action” may be asserted only against the manufacturer or the seller of the product that harmed the plaintiff. See Maness v. Boston Sci., 751 F.Supp.2d 962, 968 (E.D.Tenn.2010) (“Only sellers and manufacturers may be held liable under the. TPLA.”).
The plaintiffs’ citation to Gaines v. Excel Industries, Inc., 667 F.Supp. 569 (M.D.Tenn.1987), does not persuade us otherwise. In that case, the plaintiffs were injured by stamp presses in their employer’s plant. They sued the parent corporation of their employer, alleging under a “Good Samaritan’-’ theory that the parent corporation assumed a duty of care to the plaintiffs by performing safety-inspection tours of the plant and negligently failed to implement appropriate safety measures. In response, the defendant argued that because the claim was one for injuries resulting from the construction, assembly, testing, service, or instruction of a product (the stamp presses and related safety devices) under a negligence theory, the TPLA’s statute of limitations operated tó bar the claim.
'"The district court in Gaines disagreed with the defendant because the Good Samaritan claim was “not based on any actions defendant' took in a role as ‘manufacturer’ dr ‘seller,’ ” as those terms áre defined in the TPLA. Id. at 574. Rather, the claim against the parent corporation was due to its role as a safety inspector. The court, however, was careful tó note that any. claims relating to the parent corporation’s rol'e in “designing, fabricating, or assembling the safety apparatus attached to the presses” were in the nature of its role as a manufacturer or seller and, therefore, fell under the TPLA. Id.
In contrast to the Good Samaritan theory in Gaines, all of the claims against the Brand-Name Manufacturers in the present case are based on these defendants’ status as the manufacturers of Reglan. As such, the Brand-Name Manufacturers were responsible for proposing an accurate and adequate label to the FDA (as well as for updatihg that label), which, in turn, controlled the label for -the Generic Manufacturers through the ANDA process. They were also responsible for distributing adequate warnings about the product. But they undertook no separate duties as did the parent corporation in Gaines.
The TPLA therefore applies to all of the plaintiffs’ claims against the Brand-Name Manufacturers. Unfortu *404 nately for the plaintiffs, however, these defendants were not the manufacturers or sellers of the generic drugs that injured the plaintiffs. Yet “[i]n order to recover [under the TPLA], a plaintiff must show that the product manufactured and sold by the defendant ... caused the injuries he alleges to have sustained.” Richardson v. GlaxoSmithKline, 412 F.Supp.2d 863, 868 (W.D.Tenn.2006) (brackets and internal quotation marks omitted); see also Tenn. Code Ann. § 29-28-105(a) (“A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.” (emphasis added)); Wyatt v. Winnebago Indus., Inc. 566 S.W.2d 276, 280 (Tenn.Ct.App.1978) (stating that the “first requirement [of proximate cause] is that the defendant’s act or, in this products liability case, the defect in the product, be a cause in fact of the injury”).
The Supreme Court’s decision in Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), is not to the contrary. In Levine, the Court held that state-law tort claims against brand-name manufacturers are not preempted by federal law because “it is .not impossible for [a brand-name manufacturer] to comply with its state and federal obligations.” 555 U.S. at 581, 129 S.Ct. 1187. Specifically, the CBE process permits brand-name manufacturers to strengthen their'warnings without prior approval from the FDA, thus allowing brand-name manufacturers to comply with both state and federal law. But unlike in the present case, Levine was injured by the brand-name manufacturer’s own product.
The plaintiffs nonetheless argue that the Brand-Name Manufacturers are liable because they could foresee that physicians would rely on the information provided by the Brand-Name Manufacturers when prescribing metoclopramide. But simply because a particular harm is foreseeable “is not dispositive in determining the existence of a legal duty.” Burroughs v. Magee, 118 S.W.3d 323, 333 (Tenn.2003); accord Satterfield v. Breeding Insulation Co., 266 S.W.3d 347, 366 (Tenn.2008) (“[F]oreseeability alone is insufficient to create a duty.”). Finding the existence of a duty requires a substantive public-policy determination. See Bradshaw v. Daniel, 854 S.W.2d 865, 869-70 (Tenn.1993) (stating that, to determine the existence of a duty, the court considers whether “a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the others — or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant”).
Despite the above considerations, our dissenting colleague embraces the plaintiffs’ theory of brand-name-manufacturer liability. She repeatedly quotes the concurring opinion in Fullington v. Pfizer, Inc., 720 F.3d 739, 748 (8th Cir.2013), to support her argument that the basis for insulating brand-name manufacturers from suit has been “severely eroded” since this court decided Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011). In our opinion, however, three factors militate against reaching such a conclusion. First, the Eighth Circuit in Fullington in fact affirmed the district court’s grant of summary judgment in favor of the brand-name manufacturers, relying on its prior decision in Bell v. Pfizer, Inc., 716 F.3d 1087 (8th Cir. 2013). Judge Murphy’s four-paragraph concurrence in Fullington indeed questions the soundness of Bell and similar decisions, but is hardly enough for us to *405 overrule our own circuit’s decision in Smith
Second, we are bound by Smith’s holding even if, as our dissenting colleague contends, its analysis might be flawed. See United States v. Dunlap, 209 F.3d 472, 481 (6th Cir.2000) (“[A] subsequent panel of this circuit court is powerless to revisit, modify, amend, abrogate, supersede, set aside, vacate, avoid, nullify, rescind, overrule, or reverse any prior Sixth Circuit panel’s published precedential ruling of law.”); see also Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir.1985) (“The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.”). , Because Smith ruled in favor of the brand-name manufacturers in a case virtually identical to the one before us, the dissent’s rebanee on the concurring opinion in Fullington to reach a contrary result strikes us as misplaced.
Finally, and perhaps most importantly, we have no basis to conclude in this diversity case that the Tennessee Supreme Court would overrule its prior decisions holding that a manufacturer owes no duty of care to consumers of products made by others. Tennessee, law instead “requires manufacturers to warn of hidden and unknown dangers in their product.” Pemberton v. Am. Distilled Spirits Co., 664 S.W.2d 690, 693 (Tenn.1984) (emphasis added) (internal quotation marks omitted). Furthermore, “[d]rug manufacturers have a duty to exercise ordinary and reasonable care not to expose the public to an unreasonable risk of harm from the use of their products.” Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn.1994) (emphasis added). In Tennessee, a relationship exists between manufacturers and “those who foreseeably could be injured by the use of their products,” not those persons injured by some other product. See id. (emphasis added). This court has previously interpreted this principle to mean that “[although a product manufacturer generally has a duty to warn of the dangers of its own products, it does not have a duty to warn of the dangers of another manufacturer’s products.” Barnes v. Kerr Corp., 418 F.3d 583, 590 (6th Cir.2005) (holding that a dental-amalgam manufacturer had satisfied its duty to warn about the dangers posed by the mercury in its products even though it did not warn that those dangers remained when combined with other manufacturers’ dental-amalgam ingredients).
The plaintiffs have presented no authority indicating that manufacturers of a brand-name drug have a duty under Tennessee law to consumers of the brand-name manufacturers’ competitors, and we are loath to expand Tennessee’s substantive law without direction from the Tennessee Supreme Court. See Combs v. Int’l Ins. Co., 354 F.3d 568, 577 (6th Cir.2004) (“[W]hen given a choice between an interpretation of [state] - law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path.” (second alteration in original) (internal quotation marks omitted)).
Nor does Conte v. Wyeth, 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299 (2008), save the plaintiffs’ claims. In Conte, the California Court of Appeal stated that it “ha[d] no difficulty concluding that [the brand-name manufacturer] should reasonably perceive that there could be injurious reliance on its product information by a patient taking generic metoclopramide.” Id. at 104,’ 85 Cal.Rptr.3d 299. But this court in Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011), cert. denied, — U.S.-, 132 S.Ct. 2103, 182 L.Ed.2d 868 (2012), consid *406 ered Conte and characterized it as an outlier, choosing instead to follow Foster v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994), and the majority of other courts that have rejected such a theory. See also Mensing v. Wyeth, Inc., 588 F.3d 603, 613-14 (8th Cir.2009) (“Whatever the merits of Conte under California law, ... under Minnesota law Mensing has not shown that the name brand manufacturers owed her a duty of care necessary to trigger liability.”), rev’d in part on other grounds sub nom., PLIVA, Inc. v. Mensing, — U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011).
Although our decision is grounded in Tennessee law, we would note that every federal court of appeals to consider this issue has held that brand-name manufacturers are not liable to plaintiffs who are injured by a generic manufacturer’s drug, whether under a state’s product-liability act or under general principles of duty. See, e.g., Schrock v. Wyeth, Inc., 727 F.3d 1273, 1284-86 (10th Cir.2013) (noting that every federal circuit court has rejected— and that the Oklahoma Supreme Court would not recognize — brand-name liability under these circumstances); Guarino v. Wyeth, LLC, 719 F.3d 1245, 1251-53 (11th Cir.2013) (noting the “overwhelming national consensus” on the issue); Bell v. Pfizer, Inc., 716 F.3d 1087, 1092 (8th Cir. 2013) (same); Demahy v. Schwarz Pharma, Inc., 702 F.3d 177, 182-83 (5th Cir. 2012) (per curiam), cert. denied, — U.S. - — , 134 S.Ct. 57, 187 L.Ed.2d 26.(2018) (No. 12-1093) (same). And this court, following the majority view in Foster, has previously come to the same conclusion in Smith. See Smith, 657 F.3d at 424 (“As have the majority of courts to address this question, we reject the argument that a name-brand drug manufacturer owes a duty of care to individuals who have never taken the drug actually manufactured by that company.”).
Only three cases to our knowledge have decided the other way: Conte v. Wyeth, 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299 (2008), Kellogg v. Wyeth, 762 F.Supp.2d 694 (D.Vt.2010), and Wyeth v. Weeks, — So.3d-, 2013 WL 135753 (Ala. Jan. 11, 2013) (reargument granted June 13, 2013). For differing reasons, we find each of these cases either unpersuasive or distinguishable. As explained above, this court rejected Conte in Smith and we do so again in the present case. The district court in Kellogg, on the other hand, recognized that common-law actions for fraud and negligence with regard to product-liability claims remain viable in Vermont, the state having no statute comparable to the TPLA. 762 F.Supp.2d at 704, 707. As such, the court concluded that determining whether the plaintiff had ingested the defendant’s product was not essential to the claim. Id. at 709. The court also concluded that, under Vermont law, there was a duty on the part of the brand-name defendant to the generic’s consumer, id. at 708-09, a legal principle that is contrary to Tennessee law. Finally, the Alabama Supreme Court has decided to rehear Weeks, which makes its ultimate outcome far from certain, in sum, none of these cases persuade us to alter our analysis as set forth above. We therefore find no error in the district court’s grant of summary judgment in favor of the Brand-Name Defendants.
D. Motion to certify a question to the Tennessee Supreme Court
Finally, the plaintiffs have moved to certify the following question to the Tennessee Supreme Court: “Is there a duty on the manufacturer of a pharmaceutical drug to cease sales of a product, if that product is ‘unreasonably dangerous’ under [the] Tennessee Products Liability Act?” The Supreme Court recently rejected this very *407 stop-selling rationale “as incompatible with [its] pre-emption jurisprudence,” Mut. Pharm. Co. v. Bartlett, -U.S.-, 133 S.Ct. 2466, 2477, 186 L.Ed.2d 607 (2013), and the plaintiffs conceded at oral argument that Bartlett forecloses reliance on this theory. Accordingly, the plaintiffs’ motion has no merit.
E. “Catch 22” dilemma
Although we feel compelled to affirm the judgment below in light of the controlling caselaw, we cannot help but note the basic unfairness of this result. The plaintiffs’ problem is that all of their claims fall within the purview of the TPLA as a “product Lability action.” See Tenn.Code Ann. § 29-28-102(6). This is true despite their most artful efforts to dress up a relatively simple failure-to-warn claim in a great variety of tort and contract causes of action. The plaintiffs are therefore caught in a classic “Catch 22,” barred from all claims against the Generic Manufacturers whose drugs they ingested (due to federal preemption) and from all claims against the Brand-Name Manufacturers (due to the TPLA). See PLIVA, Inc. v. Mensing, — U.S. -, 131 S.Ct. 2567, 2592, 180 L.Ed.2d 580 (2011) (Sotomayor, J., dissenting) (“If a consumer takes a brand-name drug, she can sue the manufacturer for inadequate warnings.... If, however, she takes a generic drug, as occurs 75 percent of the time, she now has no right to sue.”).
This unfairness has been acknowledged by the Supreme Court in both Mensing (see supra pp. 388-89) and Bartlett (see supra pp. 389-91), but the Court has suggested that any resolution of this dilemma rests with Congress. Relief could also come from the Tennessee General Assembly revising the TPLA to allow claims against brand-name manufacturers whose labels control the warnings that the generic manufacturers are compelled by federal law to duplicate. . But unless or until such change comes, we find no basis to afford the plaintiffs any relief.
III. CONCLUSION
For all of the reasons set forth above, and despite the “Catch-22” dilemma, we AFFIRM the judgment of the district court and DENY the plaintiffs’ motion to certify their proposed question to the Tennessee Supreme Court.